**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| IOWA PROTECTION AND ADVOCACY SERVICES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> TANAGER PLACE and TANAGER, INC., <br><br> Defendants. | No. C 04-0069 <br><br><br><br> **ORDER** |
| TANAGER PLACE, <br><br> Counterclaim Plaintiff, <br><br> vs. <br><br> IOWA PROTECTION AND ADVOCACY SERVICES, INC., <br><br> Counterclaim Defendant. | |
| TANAGER PLACE, <br><br> Third-Party Plaintiff, <br><br> vs. <br><br> SYLVIA PIPER, <br><br> Third-Party Defendant. | |

**TABLE OF CONTENTS**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 4

1

**IV. MOTION FOR PRETRIAL DETERMINATION** .................. 6

    A.    *The Law of Defamation in Iowa* ...................... 6
    B.    *Application of the Facts* ............................ 9

**V. MOTION FOR SUMMARY JUDGMENT** ..................... 11

    A.    *Principles of Review* .............................. 11
    B.    *Truth* .......................................... 12
    C.    *Opinion* ........................................ 14

**VI. DISPOSITION** ....................................... 16

## I. INTRODUCTION

There are two matters before the court. The first matter is Counterclaim Plaintiff Tanager Place's Motion for Pretrial Determination (docket no. 51). The second matter is a Motion for Summary Judgment filed by Counterclaim Defendant Iowa Protection and Advocacy Services, Inc. ("IP&A") and Third-Party Defendant Sylvia Piper (docket no. 59).

## II. FACTUAL BACKGROUND

The facts giving rise to this dispute are set forth in a prior order of this court. *See generally Iowa Protection & Advocacy Servs., Inc. v. Tanager Place*, 2004 WL 2270002 (N.D. Iowa 2004). Only those facts pertinent to this counterclaim will be reiterated here.

Tanager Place operates a psychiatric medical institution for children ("PMIC") in Cedar Rapids. On May 29, 2004, R.J., a mentally-ill juvenile resident of the PMIC at Tanager Place, ran away. His clothes were later found next to the Cedar River after witnesses reported a person jumping off a nearby bridge.

On June 1, 2004, Tanager Place notified IP&A that R.J. had run away and may have drowned. IP&A is a private, non-profit Iowa corporation that is authorized to investigate incidents of abuse and neglect of mentally-ill individuals. *See* 42 U.S.C. §

2

10805(a)(1)(A). IP&A is funded entirely with federal money but does not report to any governmental agencies about its work.

After receiving notification of R.J.'s disappearance, IP&A determined there was probable cause that R.J. had suffered neglect or abuse at Tanager Place. IP&A faxed Tanager Place a letter, in which it announced its federal authority and advised that it was conducting an investigation. In a second letter faxed the same day, IP&A specifically asked for a list of the names of Tanager Place's residents, as well as the names and contact information of the residents' guardians.

On June 2, 2004, IP&A sent two investigators to Tanager Place. The investigators asked to see R.J.'s file and to interview staff. George Estle, the Chief Executive Officer of Tanager Place, told the investigators that the Iowa Department of Inspections and Appeals (DIA) had R.J.'s file. Estle promised the investigators they could see the file when DIA returned it. In the meantime, Estle allowed the investigators to interview staff, tour the facility, and take photographs.

The investigators then asked to interview two residents who had lived with R.J. Estle told the investigators that he would first have to consult with the Tanager Place treatment team to make sure an interview would not adversely affect the children. The treatment team, however, had already left for the day. The investigators left.

The same day, IP&A's legal director, Edie Bogzczyk, called Tanager Place's attorney, Vernon Squires, to see if IP&A could interview the residents. Squires told Bogzczyk he did not think Estle would permit IP&A to interview the residents. Sylvia Piper, the Executive Director of IP&A, called Estle to see if the two could work things out. Estle did not return Piper's phone call.

On June 3, 2004, the investigators returned to Tanager Place. They picked up a copy of R.J.'s file and again asked to speak with the two residents. Estle told the investigators he had not yet spoken with the treatment team. The investigators waited

while Estle spoke with the treatment team.

After consulting the treatment team, Estle permitted the investigators to interview only one of the two residents. The treatment team determined the other resident, C.S., was too fragile to talk with the investigators at that time. IP&A then filed this lawsuit, which seeks to fully enforce its federal mandate.

On June 5, 2004, the *Cedar Rapids Gazette*, a local newspaper, published an article about the lawsuit. The article quoted Piper as saying:

> (1) "Tanager Place has done everything within their power to roadblock our investigation."
> and
>
> (2) "When we went to the location, they refused to provide us access and delayed our ability to review records."

The *Gazette* article was republished in other newspapers across Iowa.

On June 11, 2004, a second *Gazette* article quoted Piper as saying:

> (3) "We believe these children were in immediate jeopardy for their safety."

The same article noted that during the past twelve months there were ninety-two reports of runaways from Tanager Place.

### III. PROCEDURAL BACKGROUND

As indicated, on June 3, 2004, IP&A filed a Complaint against Tanager Place.[1] IP&A alleged Tanager Place was interfering with IP&A's right to access residents, in violation of the Protection and Advocacy for Mentally Ill Individuals Act of 1986 (the "PAMII Act"), 42 U.S.C. § 10801, *et seq*. IP&A sought declaratory and injunctive relief.

---

[1] IP&A also named Tanager, Inc., the non-profit Iowa corporation which runs Tanager Place, as a defendant. It is not involved in the counterclaim.

On June 14, 2004, Tanager Place filed a Counterclaim against IP&A. In Count I, Tanager Place sought a declaratory judgment that (1) IP&A's investigation constituted an unlawful search and seizure and (2) the PAMII Act was unconstitutional both on its face and as applied. In Count II, Tanager Place asserted a state law slander claim against IP&A and Piper, whom Tanager Place joined as a third-party defendant. Tanager Place contended Piper's statements to the *Gazette* "constitute[d] slander, both per se and per quod." Tanager Place alleged Piper made the statements in the scope of her employment, and thus IP&A was liable under the doctrine of respondeat superior.

At a hearing conducted on June 16, 2004, IP&A orally moved to sever Count II of Tanager Place's counterclaim from the rest of the case. The court granted the motion.

A bench trial was held on IP&A's claims and Count I of the counterclaim on July 20, 2004. On September 30, 2004, the court issued a permanent injunction requiring Tanager Place to provide IP&A reasonable access in accordance with the PAMII Act and the regulations promulgated pursuant to it. *See generally Iowa Protection & Advocacy Servs.*, 2004 WL 2270002, at *23 (citing 42 U.S.C. § 10805 *et seq.* and 42 C.F.R. § 51.42 *et seq.*).

Following trial, Tanager Place filed a "Motion for Pretrial Determination of Defamation Per Se" on Count II of its counterclaim. Tanager Place asked the court to rule that Piper's first two statements to the *Gazette* were "defamatory per se under Iowa law." Tanager Place alleged the statements were defamatory per se because they attacked its integrity and moral character, as well as affected its business.

IP&A and Piper filed a Resistance and a Motion for Summary Judgment. In their Resistance, IP&A and Piper insisted that Piper's statements were not defamatory per se because they did not specifically charge Tanager Place with incompetence or lack of skill in its business. In their Motion for Summary Judgment, IP&A and Piper argued they should prevail as a matter of law because Piper's statements were true and, in any event,

5

constituted protected opinion.

In what follows, the court considers Tanager Place's Motion for Pretrial Determination and IP&A's and Piper's Motion for Summary Judgment.

## IV. MOTION FOR PRETRIAL DETERMINATION

In its Motion for Pretrial Determination, Tanager Place asks this court to rule in advance of trial that Piper's first two statements to the *Gazette* were "defamatory per se under Iowa law."[2] Before delving into Tanager Place's argument, a brief summary of Iowa defamation law is necessary.

### *A. The Law of Defamation in Iowa*

The law of defamation provides redress for damage to reputation. *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004). It "is composed of the twin torts of libel and slander." *Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004). Whereas libel involves written statements, slander involves oral statements. *Kiesau*, 686 N.W.2d at 174. The parties apparently assume this case involves slander because Tanager Place seeks compensation for Piper's oral statements to the *Gazette*.[3] Because the court is not

---

[2] Although Tanager Place brought its Motion for Pretrial Determination pursuant to Federal Rule of Civil Procedure 7(b)(1), the court treats it as a Motion for Summary Judgment pursuant to Rule 56. For the applicable standard of review, *see infra* Part V.A.

[3] This is not the view of the authors of the Restatement, who write:

> A publication of a libel may be made by an oral communication that is intended to be, and is, reduced to writing . . . [such as] when a statement is given orally to a newspaper reporter and is published in the paper. . . .[T]he oral communication takes on the character of libel because of the intended and actual embodiment in permanent form.

Restatement (Second) of Torts § 568 cmt. *f* (1977). Recognition of this view is important because the Iowa Supreme Court often follows the Restatement in defamation law. *See, e.g., Barreca*, 683 N.W.2d at 118 (adopting Restatement framework for determining

presented with an argument to the contrary, it likewise assumes the same.

An employer may be held liable for the defamatory statements of one of its employees provided the statements were made while the employee was acting within the scope of her employment. *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996); *Vowles v. Yakish*, 191 Iowa 368, 371-72, 179 N.W. 117, 119 (1920). The parties agree that Piper was acting within the scope of her employment when she made her statements about Tanager Place.

Ordinarily a plaintiff in a defamation lawsuit must prove malice, falsity, and damages. *Kerndt v. Rolling Hills Nat. Bank*, 558 N.W.2d 410, 418 (Iowa 1997).

> However, some statements are defamatory per se; that is, they are of such a nature that the court can presume as a matter of law that their publication will have a defamatory effect, even without a showing by the plaintiff of malice, falsity, or damage. In such cases, malice is presumed. Defamatory statements affecting a person in his or her business, trade, profession, or office fall into this category, as do attacks on a person's integrity and moral character.

*Id.* When the statement is unambiguous, the court decides whether a statement is defamatory per se. *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984).

Tanager Place claims Piper's first two statements to the *Gazette* were defamatory per se because they affected its business and attacked its integrity and moral character.[4] Tanager Place claims these statements (i.e., "Tanager Place has done everything within

---

whether a statement is qualifiedly privileged). However, it appears the Iowa Supreme Court has not yet had the occasion to consider this particular provision.

[4] In its reply brief, Tanager Place also asks the court to rule that Piper's third statement (i.e., "We believe these children were in immediate jeopardy for their safety.") was defamatory per se. The court declines to consider this issue because Tanager Place did not request such a determination in its original motion. *See* LR 7.1(g).

their power to roadblock our investigation." and "[T]hey refused to provide us access and delayed our ability to review records.") implied it was hiding something about R.J.'s disappearance—an implication which, it alleges, eroded public confidence in its ability to care for children and attacked its integrity and moral character.

IP&A and Piper urge a narrower construction of Iowa law. They contend Tanager Place must prove Piper's statements directly charged it with business incompetence or lack of skill; that is, to show her statements merely "affected" Tanager Place's business or attacked its integrity or moral character is insufficient to prove defamation per se.

This court must decide how the Iowa Supreme Court would rule if faced with the same arguments and facts. *See, e.g., Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 419-20 (8th Cir. 2005). Because the Iowa Supreme Court has applied the broader standard in a number of slander cases, the court holds that to prove defamation per se it is sufficient to show Piper's statements affected Tanager Place's business or attacked its integrity or moral character. *See, e.g., Kerndt*, 558 N.W.2d at 418 ("Defamatory statements affecting a person in his or her business, trade, profession, or office [are defamatory per se], as [are] attacks on a person's integrity and moral character."); *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994) ("An attack on the integrity and moral character of a party is [slanderous] per se. Slanderous imputations affecting a person in his or her business, trade, profession, or office are also actionable without proof of actual harm." (Citations omitted, brackets in original.)); *see also Vinson*, 360 N.W.2d at 116 (holding an attack on the honesty of an employee would be slander per se).

IP&A and Piper rejoin that the Iowa Supreme Court recently cited a law review article which opines that a narrower standard once existed in Iowa law for slander claims. *See Barreca*, 683 N.W.2d at 116 (citing Patrick J. McNulty, *The Law of Defamation: A Primer for the Iowa Practitioner*, 44 Drake L. Rev. 639, 650 (1996) [hereinafter

McNulty]5). In *Barreca*, the Iowa Supreme Court only referenced this standard; the Iowa Supreme Court made clear that the issue of slander per se was not before it. *Id.*; *see also Vinson*, 360 N.W.2d at 116 (expressly declining "to determine . . . what differences exist in Iowa, if any, in the actionability of libel and slander"). The court cannot find a single Iowa case which definitively holds that slander per se is limited to the four well-defined categories mentioned in the law review article and briefly referenced in *Barreca*. Because this court must rely upon what the Iowa Supreme Court *has* held, those cases in which the Iowa Supreme Court has repeatedly applied the broader standard to slander per se claims are dispositive.

### B. Application of the Facts

Although the court concludes the broader standard should apply, the court nonetheless declines to rule as a matter of law that Piper's statements are defamatory per se. The statements are susceptible to two reasonable constructions, and therefore the jury

---

[5] In that article, the author wrote:

> Consistent with the common law, the Iowa Supreme Court has treated verbal defamation almost the exact opposite of libel. Whereas all written defamatory statements whose danger to reputation is facially apparent are actionable per se, only four categories of oral accusations are actionable without proof of falsity, malice, and special harm. Known as slander per se, these categories consist of charges of: (1) indictable criminal conduct punishable by imprisonment or involving moral turpitude; (2) loathsome disease; (3) business incompetence or lack of skill in an occupation by which one earns a living; and (4) unchastity of a woman or a married man.

McNulty, 44 Drake L. Rev. at 650. *But see id.* (conceding that "[n]ot many slander per se cases have been decided by the Iowa Supreme Court" and "[m]any are of distant vintage and concern a charge of unchastity").

should decide if they are defamatory per se. For example, the jury could find Piper's statements about "roadblocking" and "delaying" IP&A investigators to mean that Tanager Place was hiding something about R.J.'s disappearance. In this sense, Piper's statements could be construed to attack Tanager Place's integrity and affect its business. That said, the jury could just as easily find these same statements only indicated Tanager Place was not cooperating with IP&A's investigation—because it was jealously guarding its privacy, not covering something up.

The case at bar is similar to several decided by the Iowa Supreme Court over the years. These cases hold that when a statement is susceptible to two reasonable constructions, the jury should decide whether the statement was defamatory per se. For example, in *Vinson* the defendant orally stated that the plaintiff was fired for making incorrect entries on her time card. 360 N.W.2d at 114. The district court let the jury decide whether the statement was slander per se. *Id.* at 116. The Iowa Supreme Court affirmed. It wrote:

> The rule is that when the language of the publication is unambiguous, the issue of whether the publication is defamatory per se is for the court. If the language is capable of two meanings including the one ascribed by the complainant, it is for the jury to say whether such meaning was the one conveyed.
>
> . . . .
>
> We believe that a statement that an employee was fired for making incorrect entries on her time card could reasonably be taken as imputing dishonesty to the employee. Therefore we find that [the defendant's] statement could be understood as defamatory per se. The trial court did not err in allowing the jury to determine whether the defamatory meaning was the one conveyed.

*Id.*; *accord Jackson v. Ferguson*, 181 Iowa 1192, 1193-94, 165 N.W. 326, 326 (1917)

(finding defendant's statement that his wife and her female friend were "making dates with men" while he was away was not, as a matter of law, slander per se; although the statement could imply "an appointment for some unlawful or immoral purpose" it could also mean something innocent, such as a "theater party," "card party," or "joy-riding party"). Because Piper's statements about Tanager Place are likewise capable of two constructions, the court will refrain from ruling on the issue as a matter of law and instruct the jury on both defamation and defamation per se. *See Kerndt*, 558 N.W.2d at 418 ("If a statement can have two reasonable constructions, the jury may then reach one of three possible conclusions: (1) the statement was reasonably understood as defamatory per se; (2) the statement was understood as defamatory, but not defamatory per se (the jury must then determine whether the plaintiff has shown malice, falsity, and damage); or (3) the statement was not understood as defamatory.").

For the foregoing reasons, the court denies Tanager Place's Motion for Pretrial Determination.

## V. MOTION FOR SUMMARY JUDGMENT

IP&A and Piper assert two defenses in their motion for summary judgment: truth and opinion. The court considers each in turn.

### A. Principles of Review

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable

inferences. *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005); *Woods*, 409 F.3d at 990.

### *B. Truth*

Truth is a complete defense to a defamation claim. *Delaney v. Int'l Union UAW Local No. 94*, 675 N.W.2d 832, 843 (Iowa 2004). A defendant need not establish literal truth "as long as the 'sting' or 'gist' of the defamatory charge is substantially true." *Wilson*, 558 N.W.2d at 140; *see Hovey v. Iowa State Daily Publication Bd., Inc.*, 372 N.W.2d 253, 255-56 (Iowa 1985).

> The gist or sting of the defamatory charge . . . is "the heart of the matter in question—the hurtfulness of the utterance." [The Iowa Supreme Court] determine[s] the gist or sting by "look[ing] at the highlight of the [publication], the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement."

*Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987) (quoting *Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987)). In this context, then, summary judgment is proper only if the facts underlying the gist or sting of the defamatory charge are undisputed. *Id.*

IP&A and Piper contend Piper's first two statements to the *Gazette* were substantially, if not literally true,[6] because Estle refused to let the investigators interview C.S. and delayed them from accessing R.J.'s records. Tanager Place, in turn, points out that it let IP&A interview staff, take photos, and gave the investigators access to R.J's file as soon as it became available. Tanager Place maintains it gave IP&A reasonable access

---

[6] Piper's statement that Tanager Place did "everything within [its] power" to "roadblock" IP&A's investigation cannot, of course, be *literally* true. Tanager Place did not, for example, order its staff to form a human chain around the building, stage a sit in, *etc*.

to the facility, and Piper's statements to the *Gazette* clearly assert the contrary. Tanager Place also notes Piper admitted in a deposition that she believed some of Tanager Place's actions were "reasonable" under the circumstances.

The court concludes summary judgment is improper. As the court's discussion of defamation per se showed (and the foregoing illustrates), the parties do not agree about how to interpret Piper's statements. Whereas IP&A and Piper urge the court to take Piper's statements more or less at face value, Tanager Place contends the statements were meant to impugn its integrity and imply it had something to hide about R.J.'s disappearance. Clearly, then, the parties' arguments are at cross-purposes because the parties do not, in the first place, agree about what must be shown to make Piper's statements true. The Iowa Supreme Court has repeatedly held that in mounting a truth defense the defendant carries "the burden of proving the truth of the statements *in the sense imputed to them by the plaintiff*." *Brown v. First Nat. Bank of Mason City*, 193 N.W.2d 547, 553 (Iowa 1972) (emphasis added); *see also Vojak v. Jensen*, 161 N.W.2d 100, 109 (Iowa 1968) ("[T]he defense of truth must go to the libel in its entirety and as plaintiff claims it was used."), *abrogated on other grounds by Barreca*, 683 N.W.2d at 117; *Morse v. Times-Republican Printing Co.*, 124 Iowa 707, 720-21, 100 N.W. 867, 872 (1904) (same); *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 297 (Iowa Ct. App. 1985) (considering truth of statements in the sense plaintiff imputed). IP&A and Piper do not contend Piper's statements to the Gazette are true *in the sense Tanager Place imputes to them*: that is, that Tanager Place was unreasonably delaying and roadblocking access to its facility and records because it had something to hide about R.J.'s disappearance. The court therefore cannot say as a matter of law that these statements were true. Accordingly, the motion for summary judgment is denied with respect to these two statements.

IP&A and Piper also argue Piper's third statement to the *Gazette* (i.e. "We believe

these children were in immediate jeopardy for their safety.") is true. The record contains some evidence to support this claim, such as the fact that there were ninety-two reports of runaways from Tanager Place in the twelve months preceding R.J.'s disappearance. However, Tanager Place vigorously disputes Piper's claim: whether the children were in danger is, after all, the fighting issue in this lawsuit. It is also a contested matter of fact. Because the court is convinced that there is a genuine issue of material fact warranting trial on this issue, summary judgment is not proper.

### C. Opinion

As an alternative defense, IP&A and Piper contend Piper's statements were not statements of fact, but rather mere opinion. Whether a statement is an opinion or fact is an issue for the court to decide. *See Secrist v. Harkin*, 874 F.2d 1244, 1248 (8th Cir. 1989). Under Iowa law, opinion is protected. *See Kiesau*, 686 N.W.2d at 177; *Jones*, 440 N.W.2d 884, 891 (Iowa 1989), *abrogated on other grounds by Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 224 (Iowa 1998). The Iowa Supreme Court has identified three factors a court should consider when determining whether a statement is fact or opinion: (1) the precision of the statement, (2) the verifiability of the statement, and (3) the literary context in which the statement was made. *Kiesau*, 686 N.W.2d at 177; *accord Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302-03 (8th Cir. 1986) (articulating same factors). In balancing these factors, the court must consider the statement as a whole, paying attention to its tone and use of cautionary language. *Jones*, 440 N.W.2d at 892; *accord Janklow*, 788 F.2d at 1302.

Having considered the foregoing principles, the court concludes Piper's statements to the *Gazette* were statements of fact, not opinion. All three statements were precise, specific, and verifiable. Tanager Place either did or did not "roadblock" the investigation; likewise, the children at Tanager Place either were or were not "in immediate jeopardy for their safety." Given their nature, Piper's statements are likely statements of fact. *See*

*Jones*, 440 N.W.2d at 891-92. The court recognizes that the statements were made to a newspaper reporter and must be considered in the context of a newsworthy event—the disappearance of a juvenile from a local institution. *See Kiesau*, 686 N.W.2d at 177 (noting "literary context" "includes the 'social context,' which focuses on the category of the publication, its style and intended audience, and the 'political context' in which the statement was made"); *Jones*, 440 N.W.2d at 891 (same). Although the context arguably weighs in favor of a finding of opinion, the court concludes the first two factors (precision and verifiability) weigh more heavily in the opposite direction. Under the totality of the circumstances, the court finds all three of Piper's statements are statements of fact, not opinion.

IP&A and Piper point out that Piper prefaced her third remark to the *Gazette* with a cautionary phrase: she stated "*We believe* these children were in immediate jeopardy for their safety." (Emphasis added.). IP&A and Piper claim *this* statement, at the very least, is protected opinion. The court does not find this argument persuasive under the circumstances presented in this case. As the United States Supreme Court observed,

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. . . . [T]he statement may . . . imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." . . . [It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (citations and internal quotation marks omitted); *see also* Restatement (Second) of Torts § 566 (1977). While the First Amendment protects so-called "pure" opinions, statements which may imply a false assertion of fact are nonetheless actionable. *See Milkovich*, 497 U.S. at 18-19; *Harrington*

*v. Wilber*, 353 F. Supp. 2d 1033, 1042 (S.D. Iowa 2005). Piper's statement that she believed the children at Tanager Place were in immediate danger clearly implied she knew some undisclosed facts to support this conclusion. Therefore her statement is actionable, even though she prefaced it with cautionary language. The motion for summary judgment must be denied.

### *VI. DISPOSITION*

**IT IS THEREFORE ORDERED** that:

1. Counterclaim Plaintiff's Motion for Pretrial Determination of Defamation Per Se (docket. no. 51) is **DENIED**; and

2. Counterclaim Defendants' Motion for Summary Judgment (docket. no. 59) is **DENIED.**

**DATED** this 24th day of August, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA